Morning. The first is number 19-3775. Pinkney, The Pep Boys, Manny Moe and Jack. Number, I'm sorry, Mr. Harris and Ms. Markey. Mr. Harris, whenever you're ready. Please the court. Good morning, Your Honors. Fitz, Amber and Hardeman. I'd like to reserve six minutes for rebuttal. That's fine. Thank you, Judge. Let me ask you at the outset here is. Is your argument. Are you arguing? I looked at your. Suggested instruction to the jury, I didn't see anything that related to a contractual arrangement. Why? Why wasn't that included in the proposed instruction? I'm not sure, Your Honor. I did not review that in preparation for this argument. It's not something that had been briefed to the extent that that proposed instruction to the jury did not contain something regarding contract. I believe that the existence of the contract would cross apply from other portions of that of the 1981. What was the contract here? The contract was for Pep Boys to examine and repair the tire for the Pinkneys. Your Honor. And did they get that service? They did get that service, Your Honor. However, our argument at this level and at the district court is that the receipt of that service is not dispositive for that proposition. I would direct the court to the Sixth Circuit case of Christian versus Wal-Mart stores, which had set forth a specific 1981 test to be applied in the commercial context, which accounts for one, the fact that employment law and other types of contract law are not the same, while to acknowledging that the text of the statute 42 USC 1981 makes no differentiation between employment law and other types of contracts. Yes. Before the jury was assembled, you had issues before Judge Jones as to what kind of claim there might be under 1981. And one of the two possibilities you had was the hostile retail environment. And it looks like what you were proposing seems to be a, or one could argue that it was a freestanding hostile retail environment, not necessarily connected to the contract that you say exists. And I'm just trying to piece together what was the argument you made to the jury when you lost that before the judge, so the judge says, were they denied a service? So what was the argument you were making? What were your themes to the jury? The themes to the jury, and forgive me, this was two years ago, but my memory of the argument to the jury was that at the juncture, and this is covered in the second issue of appeal, that since the service manager, Jason Morton, had indicated, I'm not doing shit for you niggers, and then told Mr. Wersher to air it up and get it out, we argued that that was an initial breach, and then Mr. Wersher's subsequent actions would be a gift as opposed to the original service. So in effect, Mr. Wersher was not acting on behalf of Pep Boys, you would argue? Not necessarily, Your Honor. Our argument is that Pep Boys breached and then formed either a new contract, or Mr. Wersher gave them a gift, or any other number of scenarios could have been possible. The important point in the case of the 1981 violation is the point of that initial breach. That, we argue, is when the tort is complete. Whatever Pep Boys does after that initial breach is irrelevant to the existence of the 1981 violation, except to the extent of potential available economic damages, either in the case of the value of the service, you know, $29.95 or whatever the case may have been, or the items that were contracted for. The fact that they eventually got those items does not erase the fact that the initial breach occurred, that the initial 1981 violation occurred, and to the extent that in this case, it was Mr. Pinkney's additional actions that led to the service being conducted. Going from behind the service counter to in front of the service counter, into the service bay, directly speaking with Mr. Wersher, then Mr. Wersher instructing Mr. Pinkney to go and occupy Jason Morton so that Mr. Wersher could do the work behind Jason's back. It just seems more like a failure to deal than a breach of contract, doesn't it? I mean, Morton, there was negotiation over a potential contract. As I understand the facts, and tell me if you disagree, the problems began when Morton tried to upsell the Pinkneys on four tires when they really only needed two. They had one bad one, but it's commonplace that when you replace one, you replace the other. So that's common, but it seems like the trouble began when Morton tried to upsell them on four tires and the Pinkneys weren't going for that, and then Morton hurls the racial epithet, which to me seems like in the middle of negotiations, Morton expresses in the most reprehensible way a refusal to deal with the Pinkneys. What am I missing there? I'm not sure that you're missing anything, Your Honor. Within the context of how this contract comes into play, Mr. Pinkney takes the vehicle to Pep Boys, informs Pep Boys what he wants done, gives Pep Boys the keys, Pep Boys is inspecting the vehicle. The contract is for the vehicle to be repaired, and whether that's a plug, whether that's new tires, that is not particularly relevant, I don't think. Pep Boys doesn't have discretion to repair it however they see fit, right? They have to get approval from the customers as to the scope of the work, and unless and until that happens, you don't have a contract, right? Obviously, if Pep Boys had done what Morton wanted and just put four new tires on the car, the Pinkneys wouldn't have had to pay for four new tires. They would have had every right to say, hey, we didn't greenlight four new tires. I agree with that, Your Honor. So where, when did the contract happen? I'm struggling to find that point, because what I'm reading is a refusal to deal with the racist comment from Morton, further interaction, and then Werscher providing gratuitous service and plug. So where's the contract? I think the contract could exist in one of two places. One, an initial preliminary contract for we are going to, Pep Boys makes the offer to inspect the vehicle. Mr. Pinkney accepts that offer by giving Pep Boys the keys, or vice versa.  And pending that inspection, I will make a, pending that inspection, you know, I want the tire plugged. I will make a, I promise to, in the future, plug that tire, or pay for that tire to be plugged. When he went in specifically to have the tire plugged, and Pep Boys takes the vehicle, and it's my interpretation that within the context of Mr. Pinkney handing over the keys with the specific expectation to have the tire plugged, which is what he told Mr. Morton needed to be done, Mr. Morton said, okay, we'll do that. We'll be done in a few minutes or a few hours or whatever the case may be. I think that's where the contract exists, when Mr. Morton knows that they're there for the plug, and then he says, we will do that. Can I just ask you a question? This gets into a little bit of agency law here, but Mr. Morton speaks in the first person. He's the service manager, but he speaks about what he's going to do. I'm not going to, and then we have a very quick downward descent. I guess what you're saying is his statement as to what he's not going to do is therefore binding on Pep Boys, even though other employees of Pep Boys still carried out the exact service that your clients wanted. I guess one of the questions is, was Morton in his capacity as service manager speaking on behalf of Pep Boys, or was he speaking on behalf of what he himself as an employee of Pep Boys would and would not do? I believe in the context of this case, Your Honor, he is speaking on behalf of Pep Boys, because he immediately thereafter gave his subordinate, Mr. Werscher, an order to air it up and get it out at that juncture, already knowing that the tire needed actually repaired, not just aired up and gotten out of there. So I think in this case, since Mr. Morton gave the order to Mr. Werscher, that puts him within the realm of a Pep Boys agent. So your answer is, he spoke in first person, that might refer to just what he's going to do, but then in conjunction with his first person speech, he then said to another employee who he had control over, don't perform the service as desired, basically. Just air it up and get it out, but don't fix the tire. Basically, yes, Your Honor. And that is further within the context of the hostile environment claim that is the first issue on appeal. That happens at the point where Mr. Morton says, I'm not doing shit for you niggers. I think that's where the Castleberry case, where Judge Ambrose had ordered in the Castleberry case that one use of that word is sufficient to state a claim for a hostile work environment. And when you bring in the Nassar case, the US Supreme Court case that says a lack of a meaningful textual difference between statutes means that those statutes have to be interpreted the same way. The fact that a hostile work environment can exist under 42 U.S.C. 1981 means that a hostile retail environment must exist under that same statute where Congress did not choose to limit the statute to employment law only. But there are key differences between the retail environment and the work environment. And so the development of the hostile work environment claim reflects many of the realities of the work environment, such as work obligations and the need to come to work to retain a job. Those same conditions aren't present in a retail environment claim where individuals may have a lot more freedom as to how they spend their money and what choices they make. I agree, Your Honor, two responses to that. First, the statute says what the statute says. Congress could have chosen to limit the enjoyment of benefits, privileges, terms, and conditions of the contractual relationship to an employment relationship. They chose not to in the 1991 amendments. Second response to that, Your Honor, is that the employment relationship, the employment context, after Castleberry in 2017, where one instance, if it was severe enough, is enough to state a claim for a hostile environment, that cross-applies to the retail environment case if the situation is severe enough. Our position is, after Castleberry, the Pygmy situation was severe enough to state a claim for a hostile environment, regardless of the differences between employment context and any other type of contractual context. I agree with you, Your Honor, that we would not be able to make a claim of pervasiveness in the retail setting, but since we are going on the severity prong, I believe we are able to state a claim there. Thank you. We'll get you back on rebuttal. Thank you. Ms. Markey. May it please the Court. My name is Nina Markey, and I am an attorney with Littler. We represent the appellee, the Pep Boys. The district court here correctly held that there is not a claim for retail hostile environment under Section 1981, where a customer has not shown that they were denied services or denied the product for which they were contracting. Now, let me just ask you in that context, when you look at the text of 1981, especially 1981b, and you read the Supreme Court's opinion in Domino's Pizza, it looks like it talks about there is some type of contractual relation, and there is an interference with it in the making or the performing or the modifying or the terminating of it. Let me give you this example. An African-American couple walks into a restaurant, and the receptionist is extremely rude to them and uses the N-word, but nonetheless seats them, and they otherwise have a meal that's a fine meal. They're not treated any differently as far as the meal goes, and they pay and they leave. Is there a 1981 action in that context? There is not, Your Honor, because the right to contract and the services for which they were contracting for there were not affected, were not blocked or impaired. I will acknowledge that the restaurant situation is a little bit different than what we have here, only insofar as there has been some dicta as to the restaurant environment, and if you have something more than what Your Honor described, that it could be actionable. But there's not a case that has found that that kind of comment alone supports liability under Section 1981. So let's say then, let's just take it to the next stage of this. Either at the restaurant or at the place where you're getting a service on a car, throughout the time of the service, is there a case in which the restaurant has a service which they need desperately in order to get back on the road? They are insulted, racial epithets are used continually, they decide they have to put up with it for the time being because they simply have to get that car back on the road and get to where they're going. And this is not just one comment from a supervisor, it's comments from the supervisor and other employees there. Is that a hostile retail environment under 1981B? To the extent Your Honor is willing to acknowledge the test put forward by Christian that plaintiffs rely on almost exclusively, we do not think that that's the proper standard. Looking at Christian, that was deciding whether or not there was a prima facie case established, whether or not there was an intent to discriminate established. That is different than what we're looking at here where we have had a jury trial and we're looking at the specific jury instruction as to whether liability can attach. We would point the court to Hammond v. Kmart Corp., which had the most factually analogous situation as to what happened here, which I would note. So what you're saying to me in answer to my question is that that is not a 1981 violation, is that correct? It is not, Your Honor. Even though 1981A says all persons within a jurisdiction of the United States who have the same right to make and enforce contracts as is enjoyed by white citizens, and B says make and enforce contracts means the making, performing, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship. If you're a white citizen, a privilege of that contractual relationship is not to be called names. It has to be the same for black persons as well, doesn't it? Your Honor, what happened as alleged, if it happened, we're not sanctioning that conduct. Plaintiffs could have proceeded under another statute, the South Carolina statute, as to the public enjoyment and public accommodation. They didn't. Here, to answer Your Honor's question more specifically, there is not an actionable Section 1981 claim despite the 1991 amendments that gave us the language that you cited to that broadened the make and enforce contracts. And that is because you still need to look at the underlying purpose of 1981, which you have to establish the nexus between the alleged discrimination and what is being contracted for. The case law is replete with references to legislative history as well as the six circuit courts that have addressed this very specific question. And they all find the underlying purpose of 1981 and that nexus between a contractual right or interest has to have been violated. Just merely the right to shop without being discriminated against is not what Section 1981 has been designed or interpreted to protect. Let me give you a slightly different hypothetical, following up on Judge Ambrose's restaurant example. Let's assume that the African-American couple is treated respectfully and politely and they're seated, but let's also assume that this restaurant has an unwritten, unstated policy of making sure that the meals served to African-Americans, the hot meals are actually cold. So you have a total disparity in service based upon race. Actionable under 1981? That would be, Your Honor, I believe so, because there you do have a difference in what was given them and what they were contracted for. All right, that's what I thought you were going to say, but now it really seems pretty anomalous, doesn't it? That if you're right, we're setting up a legal regime where hidden discriminatory treatment is actionable, but the most vile, overt, racist, in-your-face discrimination is not actionable. Why should non-white citizens have to suffer, and we're not talking just about African-Americans, right? It says all persons within the United States shall have the same right as white citizens. So talking about anybody who's non-white, why should those non-white folks have to suffer those kinds of overt indignities without having a legal remedy? As long as they get the hot meal, as long as they get the tire fix, et cetera. Doesn't that seem to violate the heart of what 1981 is trying to remedy? It doesn't because of the contractual nexus, Your Honor. In the example that you gave with not getting, as a matter of policy, a hot meal, here plaintiffs got exactly what they had asked for with their tire being plugged. I think it's important to note that there's two factual inaccuracies that are being relied upon heavily by plaintiffs in the record that are not supported by the record. One, with regard to the timing and somehow that the tire wasn't beginning to be plugged until Mr. Pinckney intervened, there is no record evidence to show that. It was not clear as to when that conversation occurred. There was nothing in the record establishing that. The record did establish, however, that Mr. Werscher, from the very beginning of his working on the car, had the tools he needed to plug that tire. There is also no record evidence to support that Mr. Morton telling him to air up the tire and get it out was somehow a denial of service. You couldn't air up the tire if it wasn't plugged. So your argument is as long as you get, quote, the benefit of the bargain, not actionable. That's the bottom line. And if your contractual nexus is not there between that discrimination, at least under Section 1981, there are public accommodation. But it talks about making contracts. I mean, doesn't that mean you don't have to actually consummate the contract? Doesn't that mean that if I'm a nonwhite citizen and I'm trying to make a contract, I go up to a deli counter and say I'd like a ham sandwich and they hurl some racial epithet at me, don't I have the right to walk away and still have a cause of action? Because I was trying to make a contract and the person, the way they treated me, told me they wouldn't deal with me or they would deal with me only by having me suffer the indignity of the insult. Wouldn't I have a cause of action by trying to make that contract even though it was never consummated? It's not whether or not it was consummated, Your Honor, there. I think you would have a claim there, and our arguments don't preclude a claim in that situation because there was no contractual service here. So, again, this tremendous anomaly. If the Pinckneys, as soon as they heard the N-word, had said we're not putting up with this stuff and left, you're saying they have an actionable claim. But because they hung in there, suffered the indignity, and got the plug, they don't have a claim. That's where we are. And that's where you go back to the contractual nexus and dominoes and Justice Scalia's opinion there. Let me just get in with a question here, which I think is absent from – I just want to confirm its absence from your brief, which in the arguments that you make, is in Judge Hardiman's example, one of his examples, he talked about a restaurant having a policy of cold meals. But sometimes individuals act in a way that is inconsistent with their employer's wishes. They're outside the scope of their employment. Have you ever argued at any point in this case that what Mr. Morton did was inconsistent with PEPFOR's general policies, and therefore he was outside the scope of his employment authority? And because he was outside the scope of his employment authority, maybe he was the actor who was impairing contracts, but PEPFOR would not be responsible for the impairment of any contract. That was an employee who was outside the scope of their employment, on a frolic and detour, as the common law called it. Have you ever made that argument? We have not, Your Honor, because the authority does not support the argument. The Circuit Authority, most notably Lopez in the 11th Circuit, makes it clear, as well as other decisions, that the PICNIs were not contracted with Mr. Morton, regardless of his title or agency abilities. They were contracting with PEPFOR, and when they received the service from Mr. Wersher, the very specific service that they had asked for, what Mr. Morton did or said to them or allegedly refused service, which again, we don't think the record supports that, and the jury didn't find that. The agency does not come into play with who he is contracting with, which is PEPFOR. He's not the individual employee. But, I mean, Section 981 speaks not in terms of breach, but in terms of impairment. And impairment is typically, breach is what a party to a contract does. Impairment can be done by non-parties to a contract. And so to the extent that there's a cause of action for impairment, it's different in some way from breach. Maybe impairment swallows breach as well. But why isn't the claim that Pep Boys was trying to do all they could, one of their employees who was outside, or the defense, one of the employees who was outside the scope of his employment was actually the impairer, and therefore liability to Pep Boys should not attach, because Pep Boys wanted to make the contract. As you say, the contract was with Pep Boys. It was supposed to be with Pep Boys. We had a bad actor on our hands. Bad actor act is the impairment, and not us. Your Honor. In Judge Hardiman's example, where it was the restaurant that had the policy. Here, it might be the actions of Mr. Morton that seem to be what causes the impairment, if one exists. And, Your Honor, our position is there was no impairment. You don't reach whether or not his conduct, insofar as it impaired Pep Boys, can be attributable to Pep Boys. The impairments, we point the court to Hammond v. Kmart, the First Circuit decision in 2013, which specifically lists, as by way of example, some of the things that can actually constitute an impairment of a contract in a retail setting. Things like not being able to pay in the same way, not receiving the same services, not being able to finish the transaction, or feeling that you need to leave before you finish the transaction. There are those items identified, none of which were maintained here. Again, they not only received service, they received the very specific service that they requested. There's also, despite the attempt to attribute Mr. Morton's comment of air it up and get it out to a refusal to service, Mr. Morton tried to service them. They didn't like what he was recommending, which I would also note the record does not support that it was an upsell. The difference between two and four tires has some other reasons that aren't necessarily in the record, but there's no... Having grown up in a gas station, I can tell you it's a 90% chance it was an upsell. I understand, Your Honor, and having worked with employers, I can see why there was. But again, we didn't have Mr. Morton to testify, so I don't want to belabor the court with things that aren't in the record. But I can tell you there's no record support for it being an upsell. So relying on that and making any conclusions, factually or legally, wouldn't be appropriate. But we do direct the court to Hammond, where you have the list, as well as in Lopez in the 11th Circuit. And we think, again, going back to the contractual nexus that is necessary, and not just the specific language of 1981b, but even after the 1991 amendments, you can't ignore the underlying premise and what you really need, and Domino's establishes this, to even bring a 1981 claim, and that is the nexus between the alleged discrimination and the contractual right. It is not, as the legislative history sets forth and the decisions even post-1991 amendments say, this is not a statute that has a general cause of action prohibiting discrimination in the retail context. That is why you see the three-pronged test that has clearly been relied upon by all six circuits, and even by the Christian court itself. You're right about that, but why not draw the line? Between browsers and shoppers. You know what I mean? I mean, clearly there's a lot of support for what you said in the terms of, if somebody walks into a retail establishment with no intention of contracting, no money in their pocket, it's going to be near impossible to prove a case, right, to make out a prima facie case. But the Pinckney's weren't that. They absolutely wanted to deal. They needed to deal. They had a bad tire. So why shouldn't we draw the line between the browsers and those who intend to contract rather than saying, well, if you intend to contract and you succeed in contracting or even get a better deal here, a gratuitous service, you're out of luck no matter how many racial epithets they hurl at you. Your Honor, I'm out of time. May I proceed to answer? You're on our time. Keep going. You're fine. Your Honor, drawing that line, I think the Domino's case is instructive as well as the Hammond decision in talking about that. The discrimination in Hammond also took place during the contractual process. The plaintiff there was trying to attempt to put items on layaway. But if you're going to allow anybody who experiences as horrible as it is, a word like the N-word, during the shopping experience, the legislative history as well as the case law is very clear that that is not the kind of broad prohibition on discrimination in the retail context at 1981 with its focus on the contractual and the right to contract. It's not designed to protect that. Was Mr. Morton fired by Pep Boys for this incident? This incident did not come to their attention until after. I don't believe this is in the record below, Your Honor. I'm happy to answer the question. But the record below, we did not have a missing witness instruction with Mr. Morton because we did subpoena him and do everything we could to try to get him to testify at trial. He was not deposed or not noticed for deposition in the case. So did he voluntarily leave or was he fired? He was not terminated for anything related to this incident. Okay. Isn't there good evidence that Wurtscher repaired the tire independently? No, Your Honor. And I actually would like to address one of Your Honor's questions and Mr. Harris's answer on his questions. He is an employee of Pep Boys. There was some closing argument that tried to suggest because of his using his own tools, which is commonplace with mechanics, that somehow he wasn't able to bind Pep Boys in his alleged, I think their characterization is cure of Mr. Morton's breach. He was acting from the beginning as soon as the car was up on the lift to repair that tire. There was a conversation with Mr. Pinckney, but that conversation in no way does the record show precipitated or caused him to take the actions he took with the tire. Did Wurtscher do it for free? He did. So if there was a contract, what happened in terms of why there was no charge in the end? If we had Mr. Morton testify, Your Honor, I think we'd be able to speak to that. Mr. Wurtscher works exclusively in the garage, and as the record shows conveys his recommendations to Mr. Morton, who then deals with the service side and the computer and the payment part of it. We don't know what happened. There's no record evidence on that point. Do you say there was a contract or there wasn't? We do. The parties are in agreement that there was a contract. What were the terms of the contract? The terms of the contract were to service the car. For free? No, but I don't think that whether or not it was for free changes whether or not there was a contract to service the car. A price term is usually a really important part of a contract, the most important part of a contract, right? We agree, Your Honor, but you can have a contract without paying for something, and the parties here are in agreement that that happened. We're in disagreement as to whether Mr. Morton was in a position to breach. So there was a contract for gratuitous service? There was a contract to have the car serviced, irrespective of whether it was gratuitous. I mean, there has to be mutuality of consideration. So just tell me, so we know what the Pinckney's wanted. They wanted their car serviced, and if there was a contract that was carried to completion, then they got the tire patch. But there has to be mutuality of consideration, right? So what did Pep Boys get? Pep Boys, in terms of mutuality of consideration, Pep Boys still had their customer support, whether or not they paid for it. You still had them wanting to have their tire serviced. Pep Boys effectuated that contract when they serviced the tire. But what did they get back? I mean, they serviced it. That's not something that Pep Boys gets back. That's something that they do. What consideration came back to Pep Boys? Your Honor, honestly, that argument wasn't raised below, and we didn't address it. I'm not sure what facts in the record I could point to to support that analysis and be able to answer your question. Well, I don't think it requires the record. If there's a contract to fix the tire, normally it's for a charge, and there was some evidence that Mr. Morton attempted to say, look, they're not going to do it. Get it out of here. Air it up. Get it out. Now, you might say that's disputed in some way. He still used the word air. Air it up, as I recall, in both your and the other side's brief. So it's not really dependent on evidence. What did Pep Boys get after Morton said that Wirtjer fixed the tire and did not charge for it? Perhaps because Morton never knew it. In the retail setting, the existence of a contract, particularly with regard to these cases, isn't dependent upon the exchange of money or the retail entity receiving money. All the time, retail entities provide things gratuitously, whether that is purposely to make the customer happy, or whether in this case it was maybe just to end the transaction once the service was provided. Isn't your strongest argument, I mean, one that's really not in the record, but that what Pep Boys got back by carrying out this service was some sort of waiver of a 1981 suit or something like that, that they actually provided everything that was due, and therefore there couldn't be a 1981 cause of action due to consummation, something along those lines. But, I mean, there's no money going to them, and there's nothing in the record that suggests they received anything else. So, I mean, maybe rather than the gift theory, it's a waiver theory, but that's really not been developed. Your Honor, there's no allegation that there wasn't a contract from plaintiffs, and that's why I'm struggling a little bit to answer these questions. But I do think that Your Honor's point touches upon, again, in the retail context. There are plenty of reasons why a retailer would provide something for free, and that doesn't mean that there was not a contractual interaction with the customer, particularly under the circumstances and the standards that we're looking at here. So, I mean, at one level, if someone at Pep Boys would have said, you know, we really disagree with how Mr. Morton treated you, we think it's really wrong, but so that you don't sue us later, we'll air up your tire for free, then you have mutuality and fix your tire. Then you have a contract, you have mutuality, you have everyone knows, but that's just not in the record. It's not, Your Honor, and I don't want to hypothesize as to what Mr. Morton or Mr. Wersher have not provided any information nor were they questioned on on this point. But, again, go back to the concept of the customer's always right, doesn't always require the exchange of money in order to have that retail contractual transaction. I'll finish where I started, in effect. If the Pygmies come in, get the service, but are mistreated throughout by the use of racial epithets that are abhorrent, I'm not saying that happened once here, but I'm saying in my hypothetical it happens continually. What actions do the Pygmies have? What causes of action do they have? Based upon where this store was located, Your Honor, in Charleston, South Carolina, they would have had a cause of action under the South Carolina Equal Enjoyment and Privileges to Public Accommodations Act. Depending on the jurisdiction in which they chose to proceed and to sue Pep Boys, they might also have the Title II Public Accommodations Claim. Would they have had an intentional, does South Carolina recognize intentional infliction of emotional distress claim? I apologize, Your Honor. I don't know whether South Carolina does. I don't believe they would have been able to proceed with that to the extent they chose to sue Pep Boys in Pennsylvania. Right. Okay. Thank you very much. Thank you, Your Honors. You're welcome. Mr. Harris? Thank you, Your Honors. I want to address a couple of parts of the response argument. First, Judge Hardiman, your question about the line being drawn between browsers and shoppers. Within the current Third Circuit, well, not Third Circuit jurisprudence, but in the district courts of the Third Circuit, that is the line that's drawn. I'd refer the court to McCrae v. Sachs and Acca v. Tommy Hilfiger. In those two Eastern District of Pennsylvania cases, the line was drawn that a person who only has a general interest, a person who is only browsing, does not have rights under 1981. Even if they are just absolutely verbally assaulted with racial epithets, et cetera, they still don't have a cause under 1981? Yes, because Pep Boys is right that there has to be a contractual nexus in order for 1981 liability to attach. The decisions of the district courts in the circuit are that you show that nexus by having a specific intent to contract. So you're going there for the specific purpose of contracting. In the case of McCrae v. Sachs, the critical language was that the plaintiffs only showed a general interest in the shirt. That was an issue. They didn't, you know, pick it up and take it to the register and try to pay for it. They didn't, they didn't, there was no evidence of anything other than that general browsing interest. And that's why in the McCrae case, there was no 1981 liability available because there was not a nexus to contract. In this case, we argue that we do have that nexus even under the McCrae standard, which it sounds like Pep Boys judicially admits. What's a little bit different, I think, Mr. Harrison, what you just said, though, is that the jury, the proffered jury instruction on hostile retail environment that was rejected by Judge Jones. I didn't see anything in there about contractual nexus. Is there again, Your Honor? I don't know. I don't have that one in my head, unfortunately, but I don't believe that that would be fatal to the claim since there were jury instructions on 1981 proper. But you got your day in court on that, and you lost, though, right? We got our day in court on that one. You didn't get your day in court on hostile retail environment. You proffered a jury instruction on hostile retail environment. There was briefing on it. District judge rejected it, but that jury instruction didn't say anything about contract. My memory is that the rejection of the hostile retail environment jury instruction was premised on, one, the Third Circuit had not yet stated that a hostile retail environment was possible, and, two, that it just wasn't possible. It was essentially a 12B6 decision. If it was an issue in the district court that said, you know, this isn't going to be a jury instruction because there's nothing in here about the actual contract, that could have been added at that time, Your Honor. The core of the argument here, though, is whether or not a hostile retail environment is legally possible within the context of 42 U.S.C. 1981. Pet Boy's position is that it is not, as long as there is a completion of the contract. But if you consider, one, that 1981 applies to employment law as well, in employment law, you don't need to quit your job in order to sustain a claim for a hostile work environment. You can sustain a claim for a hostile work environment without constructive discharge. When Your Honor asked about the deli sandwich, and whether somebody who tries to get a deli sandwich and then decides, I'm not dealing with this, and leaves, that person does state a claim under 1981. The comparison is a hostile work environment with constructive discharge. But a hostile work environment is not contingent upon a constructive discharge. That same analysis applies here. Just because the Pinckney's didn't leave, and in this case they couldn't leave, Pet Boy's had their car, that doesn't mean that a hostile retail environment did not occur at the point where the service manager says, I'm not doing, well, we know what he said. We don't need to repeat it again. Can we rule in your favor, even if we don't recognize hostile retail environment, can we just look at the text of 1981 and say that they tried to make a contract, and when the racial epithet was hurled, that violates 1981? I believe it does violate 1981, but only under that enjoyment of all benefits, privileges, terms and conditions language, which is the same language. Well, I don't think that helps you, though, because that's after the contract is formed. And that's why I asked you earlier about refusal to deal, because as I read the record, when Morton hurled the racial epithet, they hadn't yet formed a contract. They were trying to form a contract. Certainly, Your Honor. And within the context of 1981, interference with contract can attach liability, termination of contract can attach liability. So as Your Honor said, the contract had already been formed. No, I don't think it was formed. I'm saying they were trying, my reading is they were trying to make a contract. The Pinckney's were trying to make a contract that involved getting their car fixed. When Morton said what he said. And so you're not even, you're not yet at enjoyment of all benefits, privileges because you never made the contract. And I think that is where it comes into the other ways that 1981 can be violated, whether it's the making, the discriminatory negotiation, and that's my time. May I finish? Yes, go ahead. Pep Boys had brought up that within the context of the record, there is confusion about the order of things. First of all, it was entirely on video. There's no question that Mr. Pinckney goes out into the service bay, talks to Mr. Werscher. Mr. Werscher testified at trial that after that conversation, he told Mr. Pinckney to go and occupy Mr. Morton so that Mr. Werscher could, quote, take care of Mr. Pinckney. In the context of your question, Your Honor, in terms of whether it could be a discriminatory refusal to contract, we would argue that that has been actionable the whole time 1981 existed. The 1991 amendments expanded 1981 beyond refusal to contract, beyond refusal to hire in the employment context, to include modification, performance, termination, and so forth and so on. Your Honor asked a very prescient question of Pep Boys' counsel related to the fact that the Pinckneys did not pay for this alleged service. That then could have been an interference with the Pinckneys' ability to perform their contract, and that would have violated 1981. But the argument for this first issue on appeal, and for the oral argument, the only issue on appeal, is whether or not a hostile retail environment is legally possible, given the statutory text of 1981 and the way that that text is interpreted across Title VII, ADA, ADEA, and USERA. Thank you very much. Thank you. Thank you to both counsel for being with us. I would ask if a transcript could be prepared for this oral argument, and I ask Ms. Markey, is it okay with Pep Boys people to pay for that transcript? Yes, Your Honor. All right, thank you. Is it possible to see both counsel up here, if we may? Erica, if you turn off the mic.